IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION FOR A WARRANT AUTHORIZING THE INSTALLATION AND MONITORING OF A TRACKING DEVICE IN OR ON A 2008 WHITE FORD ESCAPE VIN 1FMCU93168KA05936, NH REG 4631207 AND A 2011 BLACK GMC TERRAIN, VIN 2CTFLXE59B6243027, NH REG 4346789 | Case No. __19-mj-170-01-AJ_____  <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Task Force Officer Kevin Rutina, being first duly sworn, hereby depose and

state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am an investigative or law enforcement officer of the United States

within the meaning of Section 2510(7) of Title 18, United States Code, and am

empowered by law to conduct investigations of and to make arrests for offenses

enumerated in Section 2516 of Title 18, United States Code.  I also am a "federal law

enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal

Procedure.

2.      I make this affidavit in support of an application for a search warrant

under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117 to authorize the

installation and monitoring of a tracking device in or on the following two vehicles: a

2008 white Ford Escape, with vehicle identification number 1FMCU93168KA05936,

New Hampshire registration 4631207, registered to Yariana Batista Mendez, 403 Amerst

1

St. Apt. 2, Manchester, New Hampshire ("the White Escape") and a 2011 black GMC

Terrain, with vehicle identification number 2CTFLXE59B6243027, New Hampshire

Registration 4346789, registered to Karen L Ben, 256 Beech St., Apt. 1, Manchester,

New Hampshire ("the Black Terrain"), believed to be used by a drug trafficker known

only as "Chino" (together, the "Subject Vehicles").[1] Based on the facts set forth in this

affidavit, I believe that the Subject Vehicles are being used by Chino and others in

furtherance of violating Title 21, United States Code, Sections 841(a)(1)(distribution of

controlled substances) and 846 (conspiracy to distribute controlled substances) and that

there is probable cause to believe that the installation of a tracking device in or on the

Subject Vehicles and use of the tracking devices will lead to evidence, fruits, and

instrumentalities of the aforementioned crimes as well as to the identification of

individuals who are engaged in the commission of those and related crimes.

3.      I am a Trooper First Class with the New Hampshire State Police Narcotics

Investigations Unit assigned as a Drug Enforcement Administration ("DEA") Task Force

Officer with the Southern New Hampshire DEA High Intensity Drug Trafficking Area

Task Force in the Manchester District Office and have been so assigned since March of

2019. I have been employed by the New Hampshire State Police since February of 2008.

My duties and responsibilities include the investigation of federal crimes, including

---

[1] On July 31, 2019, Judge Andrea K. Johnstone issued a search warrant authorizing tracking devices on these two vehicles as well as a third vehicle, a 2008 black Hyundai Santa Fe with vehicle identification number 5NMSG73D38H171767, New Hampshire registration 3568751, registered to Karen L Ben, 256 Beech St. Apt. 1, Manchester, New Hampshire ("the Black Santa Fe"). Agents located the Black Santa Fe and installed the tracking device on Monday August 5, 2019. The Black Santa Fe is referenced throughout this affidavit. References to the "Subject Vehicles" in this affidavit, include all three vehicles used by Chino and referenced in the first affidavit, referenced and incorporated herein.

violations of 21 U.S.C. §§ 841(a)(1) and 846. I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, heroin, fentanyl, and other substances. I have received significant training in the field of narcotics enforcement and investigations. Through my training, education, and experience, I have become familiar with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement.[2] In the course of participating in investigations of drug distribution organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search warrants, debriefings of subjects, witnesses, and confidential informants, and reviews of consensually recorded conversations, meetings, and Title III intercepts.

4.       Based upon my training, experience, and involvement in prior investigations, I know that individuals who distribute drugs often utilize motor vehicles in order to obtain quantities of controlled substances from their source of supply for distribution. I also know that individuals who are engaged in the distribution of controlled substances utilize motor vehicles in order to transport controlled substances to various locations in order to meet with and distribute controlled substances to prospective purchasers. They also use motor vehicles to transport drug proceeds to and/or from their illicit transactions, as well as to and/or from locations where these proceeds may be

---

[2] Observations made and conclusions drawn throughout this affidavit that are based on my training and experience also include the training and experience of other law enforcement agents and officers with whom I have discussed these issues.

counted and stored. Because individuals who are involved in the distribution of controlled substances are highly cognizant of the presence of law enforcement, and often engage in counter-surveillance maneuvers while traveling in a motor vehicle, it is frequently difficult for law enforcement officers to effectively conduct surveillance. The presence of a tracking device on a motor vehicle which is being utilized for the distribution of controlled substances or the transportation of drug proceeds is beneficial because it allows law enforcement officers to track the movement of the vehicle effectively and to decrease the chance of detection.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. In preparing this affidavit, I have prepared reports and reviewed reports prepared by other investigators of witness interviews, surveillance, and other investigative efforts regarding this investigation. In addition, I have discussed this investigation with other officers involved in the case. Through these conversations and my own analysis of these reports, I am familiar with all aspects of this investigation. The information contained in this affidavit is submitted for the sole purpose of supplying probable cause for the issuance of an order authorizing the government, at any hour of the day or night, to install, monitor, maintain, and remove a mobile tracking device which transmits an electronic signal that can be used to detect the movement and location of the above described Subject Vehicles, and make surreptitious entry into the vehicle at any hour of the day or night to install the mobile tracking device, maintain the mobile tracking device, or remove the mobile tracking device. This affidavit does not set forth all of my knowledge about this investigation.

## PROBABLE CAUSE

### The White Escape

6.      The affidavit is based, in part, on information provided by confidential human sources ("CHS") and sources of information ("SOI"). CHS1 and CHS2 provided information to the Manchester Police Department ("MPD") about a drug trafficker named "Chino" working in the Manchester, New Hampshire area. CHS1 and CHS2 are in a romantic relationship. They originally began cooperating with the MPD after CHS2 was arrested on charges related to drug possession. In exchange for CHS1 and CHS2's cooperation, CHS2 received favorable treatment with respect to those charges, which have since been resolved. Even after the charges were resolved, CHS1 and CHS2 continued to cooperate in exchange for money. CHS1 has no criminal history. CHS2 has multiple convictions including for possession of controlled drugs, forging of inspection stickers, receiving a stolen motor vehicle, possession with intent to distribute drugs, operating with a suspended license, assault and battery, theft, assault and battery on a police officer, destruction of property, disorderly person, and burglary. At one point during his/her cooperation, in approximately June of 2019, officers found out that CHS2 began selling drugs for Chino again. When confronted, CHS2 admitted what he had done and apologized, recognizing that it was a violation of his/her cooperation agreement. For some time, CHS2 was not used to cooperate. In the summer of 2019, CHS2 began cooperating again, with the understanding that he/she could no longer engage in illegal activities. Since CHS1 and CHS2 began cooperating again, other officers and I have corroborated their information through surveillance and other sources and have found it to be reliable.

7.      According to CHS2, Chino runs a drug business in Manchester and employs numerous runners who sell drugs out of various houses in the city.[3] CHS2 used to work as a runner for Chino. He/she knew that Chino would give runners "packages" of drugs including approximately the following quantities: ten fingers (10 gram packages) of a mixture of heroin/fentanyl, ten half fingers of heroin/fentanyl, 40 bags of crack cocaine (containing about .4 grams each), 40 bags of powder fentanyl and 20 bags of powder cocaine. Runners work on shifts and at the beginning of each shift are provided with a "package" of drugs and sent to one of the houses in Manchester. Runners were frequently sent to different houses throughout the city. The houses were often owned by Chino's drug customers who were compensated for the use of their house with drugs. Once a runner arrived at a house, they would typically remain there for a shift, meeting various drug customers sent by Chino. According to CHS2, Chino employed multiple runners and the business ran 24 hours a day seven days a week. CHS2 knows this because he/she used to work as a runner and has bought drugs for his/her personal use from Chino for a long time. He/she bought drugs from Chino as recently as June 2019.

8.      In May 2019, CHS2 sent officers a photograph of the White Escape and told them that Chino uses the vehicle. CHS1 and CHS2 also told officers that Chino used a house at 219 Belmont Street #6 in Manchester, New Hampshire ("the Belmont Street Residence"). CHS2 said a girlfriend of Chino's lives there and Chino uses it as a distribution center to meet his runners and give them their daily "packages." Officers

_____

[3] CHS1 and CHS2 described Chino as a Hispanic male with numerous tattoos and distinct piercings.

have conducted surveillance of the Belmont Street Residence and confirmed that various individuals suspected to be runners working for Chino frequent the residence.

9.      On June 25, 2019, CHS1 conducted a controlled purchase of approximately 100 grams of suspected heroin/fentanyl from Chino at the Belmont Street Residence. CHS1 wore a video recording device during the purchase and Chino's face was clearly captured on video. During this purchase, the White Escape was parked outside the Belmont Street Residence. On at least three occasions between June 4, 2019 and July 5, 2019, officers observed Chino drive the White Escape to the Belmont Street Residence and enter the residence.

10.     On July 26, 2019, CHS1 and CHS2 conducted another controlled buy from Chino through one of his runners. They placed a call to Chino who directed them to 55 South Main Street, #602 in Manchester, New Hampshire, which they recognized as an apartment Chino's runners had used in the past. They went inside the apartment and met with a runner who told them he was waiting for his shipment. While CHS1 and CHS2 were inside, officers observed the White Escape pull up and parked across from the building. An unidentified Hispanic female wearing a blue skirt exited the White Escape and walked inside holding a baby. She exited the building about five minutes later and drove the White Escape away.

11.     According to CHS1 and CHS2, while they were in the apartment, a Hispanic female with a blue skirt carrying a baby entered. This description is consistent with officers' surveillance of the woman leaving the White Escape. Inside the apartment, the woman stated that her baby was Chino's baby. She pulled a package of drugs out of her purse which contained heroin/fentanyl and crack cocaine and gave it to the runner.

7

The woman then left and the runner took drugs out of the package to sell to CHS1 and CHS2. I therefore believe that this unidentified woman used the White Escape to delivery Chino's drugs to the runner that day.

<u>The Black Santa Fe and the Black Terrain</u>

12.     CHS3 also provided MPD with information about Chino.[4] CHS3 was the target of an MPD investigation in the winter/spring of 2019, during which the MPD conducted numerous controlled buys of heroin/fentanyl from CHS3 and his/her relative. When CHS3 was arrested, he/she agreed to cooperate in exchange for favorable consideration with respect to his/her charges and those of his/her relative. While CHS3 was cooperating, he/she began selling drugs again and the MPD began conducting additional controlled buys from him/her. Since that time, he/she has not been used to actively cooperate. He/she still has pending charges and he/she has not been given any credit for cooperation. CHS3 has been convicted of possession of controlled drugs (multiple), bail jumping, shoplifting, habitual offender, theft (multiple), and resisting arrest and is a drug user.

13.     When CHS3 began cooperating, he/she said that he/she worked for Chino selling drugs. He/she said that on more than one occasion, Chino directed him/her to drive vehicles to Boston on his behalf. He/she believed that the vehicles contained hydraulic hides which Chino used to store drugs. The vehicles he/she drove included a black GMC (consistent with the Black Terrain), a black Hyundai SUV (consistent with

---

[4] CHS3 provided a consistent description of Chino as a Hispanic male with multiple tattoos and unique piercings.

the Black Santa Fe), a white Subaru, and others. When he/she would arrive at a location

in Boston, he/she would get of the car and take a walk at which time he/she believed

someone would then put drugs in the hydraulic hides in the cars. He/she would return to

the car and drive it back to Manchester. Although CHS3 did not typically see where in

the car the drugs were hidden, on one occasion, someone physically gave him/her a

quantity of the drugs telling her that the hide in the car was broken. CHS3 was paid in

money or drugs for conducting these deliveries for Chino.

14.     In August of 2018, SOI1 told the Manchester Police Department that he

purchased crack cocaine and fentanyl from a Dominican male he knew as Chino, giving a

description consistent with that provided by the other CHSs. SOI1 said that his father

worked on Chino's cars and SOI1 provided officers the license plate of the Black Santa

Fe as one of the cars he knew Chino to use. SOI1 had no pending charges and was not

paid for his information. He told police that he was upset with Chino because of a dispute

about money, which is why he provided this information to police. SOI1 has convictions

for theft, burglary (multiple), disorderly conduct, trespassing, armed robbery, and false

report.

15.     CHS4 and CHS5 also provided information about Chino and the Subject

Vehicles. CHS4 and CHS5 are in a romantic relationship. They sold drugs together and in

the fall/winter of 2018-2019 were the targets of an MPD investigation during which MPD

conducted various controlled buys of heroin/fentanyl from them. After their arrests, they

agreed to cooperate in hopes of receiving favorable treatment with respect to their

pending drug charges. CHS4 has been convicted of credit card fraud. CHS5 has no

convictions but in addition to drug charges, may face charges relating to his/her use of a false identity to obtain a driver's license.

16.     According to CHS4, before Chino's business expanded, he would deliver drugs directly to customers. At that time, CHS4 used to work as his driver, taking him to deliver drugs to customers. Chino and another drug associate later paid for CHS5, a citizen of the Dominican Republic, to be smuggled into this country. CHS5 then became a runner for Chino and CHS4 would drive CHS5 to deliver drugs to customers. CHS4 and CHS5 provided officers with photographs of Chino which match the person in the video of CHS1's controlled purchase as well as the descriptions of Chino given by the other confidential sources discussed in this affidavit.

17.     CHS4 and CHS5 told officers that Chino used multiple cars and an older blonde woman registered cars in her name on his behalf.[5] CHS4 took officers to a residence on Beech street where she believed the woman resided. CHS4 had been inside the apartment before and observed that the woman to kept paperwork for cars and apartments on behalf of Chino. The residence CHS4 showed officers is located at 256 Beech Street, the registered address for the Black Santa Fe and the Black Terrain. The description of the older blonde woman matches that of the registered owner of both vehicles, Karen Ben. CHS4 knew that the blonde woman living at the Beech Street apartment had registered a black GMC (consistent with the Black Terrain) and a black

---

[5] I know, based on my training and experience, that drug traffickers frequently use vehicles registered in other people's names to make it more difficult for law enforcement officers to identify them.

Hyundai (consistent with the Black Santa Fe) for Chino. CHS4 had seen a hydraulic hide

under the driver's seat of the black Hyundai, which I believe to be the Black Santa Fe.

18.     On June 14, 2019, officers conducting surveillance of the Belmont Street

Residence (where CHS1 conducted a controlled buy from Chino) observed Karen Ben

and her husband John Byrne park outside the residence and wait. Shortly thereafter,

Chino drove up to the residence in the White Escape. All three walked toward the

Belmont Street Residence together.

19.     Officers have observed Chino driving the Black Santa Fe on June 16,

2019, July 2, 2019, and July 18, 2019. Although officers have not observed Chino driving

the Black Terrain, they have observed it parked outside the Belmont Street Residence on

numerous occasions and have observed various other people driving it. One person who

has driven it on multiple occasions has a registered address at the Belmont Street

Residence and CHS1 and CHS2 believe her to be a girlfriend of Chino. Several

unidentified males have also been observed driving it to and from the Belmont Street

Residence.

20.     CHS 1, CHS 2, CHS 3, CHS 4, and CHS 5 have all told officers that they

know Chino to drive multiple vehicles and to rotate his vehicles frequently. They also

have all stated that they know him to use vehicles to transport drugs. All three vehicles

have been observed both at the Belmont Street Residence and at another residence in

Manchester, 263 Merrimack Street in the early morning hours over the summer of 2019. I

believe that Chino and his associates have used all three vehicles in furtherance of drug

trafficking activities. I believe he uses them interchangeably as all of them are frequently

parked at the same locations.

21.     On or about July 31, 2019, United States Magistrate Judge Andrea K. Johnstone issued search warrants authorizing the installation of a tracking device on the White Escape, the Black Santa Fe, and the Black Terrain. A device was affixed to the Black Santa Fe on August 5, 2019. Since the original warrant was issued, officers learned that the White Escape was registered to another person with a new license plate. Officers therefore seek a new warrant to reflect the correct registration and license plate number. In addition, officers were unable to locate the Black Terrain during the previously authorized period and seek additional time to locate the vehicle and install the device.

22.     Officers have observed the Subject Vehicles in the District of New Hampshire during various days over the last month. A tracking device on the Subject Vehicles will expand the limited capabilities of this investigation and will be valuable in allowing investigators to effectively follow the movement of Chino at all times, to include times when physical surveillance is not possible or practical, while decreasing the chance of detection. This affiant and other involved investigators intend to utilize this information to assist with the possible interdiction of future drug deliveries, as well as to assist in identifying sources of supply, customers, drug and/or currency stash locations, and locating other evidence that will assist in learning the full nature and scope of Chino's criminal activities.

23.     In order to track the movement of the Subject Vehicles effectively and to decrease the chance of detection, I seek authorization to place a tracking device in or on the Subject Vehicles while they are in the District of New Hampshire. Because Chino and others sometimes park the Subject Vehicles in driveways and on other private property, it may be necessary to enter onto private property and/or move the Subject Vehicles to

effect the installation, repair, replacement, and removal of the tracking device. Specifically, I seek authority to enter onto the premises of 263 Merrimack Street or 219 Belmont Street in Manchester, New Hampshire to install the devices as the vehicles have been parked in the driveways of those residences. To ensure the safety of the executing officer(s) and to avoid premature disclosure of the investigation, it is requested that the court authorize installation, maintenance, and removal of the tracking device during both daytime and nighttime hours. The Subject Vehicles will be highly visible during daytime hours. Therefore, it is hereby requested that the Honorable Court allow for law enforcement officers to install the tracking device at any time in the day or night.

24.     In the event the Court grants this application, there will be periodic monitoring of the tracking device during both daytime and nighttime hours for a period not to exceed 45 days following issuance of the warrant. Because Chino or others may sometimes park the Subject Vehicles on private property, this application also requests authority to make covert entry, without approval or knowledge of the owner, custodian, or occupants onto private property, if necessary, being the driveway, land, and curtilage of 263 Merrimack Street., Manchester, New Hampshire or 219 Belmont Street, Manchester, New Hampshire. This application also requests authority to make covert entry into, or possibly move, without approval or knowledge of the owner, custodian, or user, the Subject Vehicles, if necessary, to effect the same. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

**AUTHORIZATION REQUEST**

25.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, that authorizes members of the DEA or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install a tracking device in or on the Subject Vehicles within the District of New Hampshire within 10 days of the issuance of the proposed warrant, to maintain, repair, and/or replace the tracking device as necessary, and to remove the tracking device from the Subject Vehicles after the use of the tracking device has ended; to install, maintain, and remove the tracking device during both daytime and nighttime hours; and, if necessary, to surreptitiously enter the resident parking areas of the locations specified herein to effect the installation, repair, replacement, and removal of the tracking device; and to monitor the tracking device for a period of 45 days following the issuance of the warrant, including when the tracking device is inside private garages and other locations not open to the public or visual surveillance, both within and outside the District of New Hampshire.

26.     In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I further request that the warrant delay notification of the execution of the warrant for 30 days after the end of the authorized period of tracking (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution,

destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and

change patterns of behavior.

Respectfully Submitted,

/s/ Kevin Rutina
Kevin Rutina
Task Force Officer
Drug Enforcement Administration


Subscribed and sworn to before me on August 9, 2019.

ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE